FILED
2024 Jul-11 AM 10:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**OF THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| PEGGY NELSON and CHRISTOPHER WILLIAMS, *on behalf of themselves and all others similarly situated*,<br><br>Plaintiffs,<br><br>v.<br><br>MUNICIPAL PARKING SERVICES, INC.<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Peggy Nelson ("Ms. Nelson") and Christopher Williams ("Mr. Williams"), through their attorneys, bring this Class Action Complaint against Defendant Municipal Parking Services, Inc. ("MPS" or "Defendant"). Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts, and upon information and good faith belief as to all other matters based on the investigation conducted by Plaintiffs' attorneys.

## INTRODUCTION

1. This is a privacy class action lawsuit against Defendant MPS for knowingly obtaining and using statutorily protected personal information—including names, addresses, and telephone numbers—from the Alabama Department of Motor Vehicles, and other states' departments of motor vehicles ("DMV"), in violation of the Driver's Privacy Protection Act, 18 U.S.C. § 2721-2725 ("DPPA").

2. Defendant MPS is a business that provides "automated parking enforcement" to owners and/or operators of parking lots and decks nationwide. MPS's technology and systems allow its customers to manage and enforce their parking lots and decks (many of which are gateless and without a parking attendant) around the clock with cameras to ensure driver compliance. These

cameras leverage License Plate Recognition ("LPR") technology. MPS's technology allows its customers to identify alleged violators by their license plates. MPS then distributes "notices" to alleged violators demanding payment for expired or unauthorized parking.

3. Essentially, MPS's system is intended to automate parking lots using sophisticated cameras and other technologies that capture the license plate information of every vehicle that enters and exits the lot. The system is designed to track how long vehicles stay in the parking lot and whether the driver of the vehicle paid for parking through a website or mobile application.

4. MPS manages parking lot enforcement in many states across the United States.

5. MPS also contracts with other parking management companies (MPS's "Partners") to act as their "enforcement vendor," which includes accessing DMV motor vehicle records on behalf of the Partners and sending out collections "Notices" or "Citations" to persons who allegedly owe them money for parking violations.

6. The parking lots operated by MPS and its Partners have no entrance gates or other physical barriers indicating that the lot is private and monitored by cameras. Instead, signage is posted sporadically around the edges of the lots. There are no barriers at the exits, either.

7. Unsurprisingly, many people—like Ms. Nelson—do not realize that the parking lots that were previously free are now paid lots being monitored by MPS or MPS's Partner's.

8. Mr. Williams was mistakenly told by the restaurant he was dining at that the MPS-operated parking lot was free for its patrons.

9. If a driver misses the posted signs regarding payment, is unsure how or where to pay, and leaves the unattended parking lot without paying, MPS and its Partners capture the vehicle's license plate information.

10. MPS then illegally uses the license plate information to obtain the vehicle owner's

personal information from DMV records to send harassing letters and other communications in an attempt to collect outrageous parking fees and extortionate "penalty" charges, which are not posted or otherwise disclosed at the parking lots.

11. For example, Ms. Nelson received a "ticket" from MPS totaling $115.00 for unknowingly parking in a lot operated or enforced by MPS for just 35 minutes.

12. In other words, MPS and its Partners utilize MPS's LPR technology to capture the license plates of each vehicle that parks in lots operated by MPS and the driver either fails to pay or overstays their payment amount. MPS then knowingly and unlawfully obtains individuals' vehicle registration information from the DMV to attempt to extort exorbitant sums of money as payment for an alleged simple parking violation.

13. MPS obtained—and continues to obtain—protected personal information including names, addresses, and telephone numbers of Plaintiffs and Class Members, from non-public motor vehicle records in violation of the DPPA.

14. MPS then discloses and uses that protected personal information to mail Plaintiffs and Class Members surprise bills they never agreed to pay—doubling, tripling, and even quadrupling the charges within weeks of the initial demand and threatening to send the bills to collection agencies or the credit reporting agencies if not paid immediately.

15. The DPPA prohibits Defendant from knowingly obtaining or using personal information—such as "name," "address," "telephone number" and other information that identifies individuals—from motor vehicle records, including information from the DMV. Defendant knowingly and without authorization obtained and used such information of Plaintiffs and members of the Class in violation of the DPPA.

16. MPS's entire business model is based on willfully and recklessly ignoring the

privacy protections afforded by the DPPA so it can harass consumers into paying them money.

17. Plaintiffs seek, on behalf of themselves and each member of the proposed Class, statutory damages under the DPPA in the amount of $2,500 for each violation, reasonable attorney's fees and other litigation costs reasonably incurred, and such other equitable relief as the court determines appropriate, including injunctive relief in the form of a prohibition on Defendant obtaining, using, and/or disclosing protected personal information obtained from the DMV without a permissible purpose.

**PARTIES**

18. Plaintiff Nelson is a natural person over the age of nineteen and a citizen of Alabama, residing in Birmingham, Alabama, where she intends to remain.

19. Plaintiff Williams is a natural person over the age of nineteen and a citizen of Alabama, residing in Montgomery, Alabama, where he intends to remain.

20. Defendant Municipal Parking Services, Inc. is a corporation organized under the laws of Minnesota with its principal place of business at 11305 Four Points Dr., Building 2, Suite 300, Austin, Texas 78726.

**JURISDICTION & VENUE**

21. This Court has original jurisdiction over this civil action under the Class Action Fairness Act of 2005. The amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and there is minimal diversity because the named Plaintiffs and certain members of the Class are citizens of a different state than Defendant, as required by 28 U.S.C. §1332(d)(2).

22. This Court has federal question jurisdiction over this action pursuant to 28 U.S.C. § 1331, as the action arises under the Driver's Privacy Protection Act, 18 U.S.C. § 2721-2725.

23. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because a substantial part of the alleged wrongful conduct and events giving rise to the claim occurred within this district, Plaintiff Nelson resides in this district, and MPS conducts substantial business in this judicial district. Defendant's contacts here are sufficient to subject it to personal jurisdiction.

## FACTUAL ALLEGATIONS

### A. ***History and Background of the DPPA***

24. To protect the privacy and safety of licensed drivers, and to limit misuse of the personal information contained in these DMV record systems, Congress, in 1994, enacted the DPPA. The DPPA imposes strict rules for collecting the personal information in driver records and provides for liability in cases where an entity improperly collects, discloses, uses or sells such records. *See generally* 18 U.S.C. § 2721, *et al*.

25. The DPPA safeguards drivers' personal information from disclosure by state DMVs or acquisition by a third party for any purpose other than the limited permissible purposes expressly delineated in the DPPA.

26. In creating special protections for data in this particular context, the DPPA responded to concerns over the personal information captured and retained by state motor vehicle records. Congressional testimony in 1993 highlighted potential threats to privacy and personal safety from disclosure of personal information held in state DMV records; "[u]nlike with license plate numbers, people concerned about privacy can usually take reasonable steps to withhold their names and address[es] from strangers, and thus limit their access to personally identifiable information" in other records. *See* 140 Cong. Rec. H2523 (daily ed. Apr. 20, 1994) (statement of Rep. Edwards); *ibid.* (statement of Rep. Moran).

27. Personal information protected by the DPPA "means **information that identifies**

**an individual**," which may "include[e] an individual's photograph, social security number, driver identification number, **name**, **address** (but not the 5-digit zip code), **telephone number**, and medical or disability information . . . " that is obtained "in connection with a motor vehicle record." 18 U.S.C. § 2725(3) (emphasis added); 18 U.S.C. § 2721(a)(1).

28. "Motor vehicle record" is defined to include "any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles[.]" 18 U.S.C. § 2725(1).

29. Further to 18 U.S.C. § 2724, "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains."

30. The DPPA's general prohibition on disclosure of personal information is subject to fourteen (14) exceptions—the permissible purposes—which allow for the limited disclosure of personal information. Those 14 permitted uses of DMV data are designed to "strik[e] a critical balance between an individual's fundamental right to privacy and safety and the legitimate governmental and business needs for th[e] information." 140 Cong. Rec. 7925 (1994) (remarks of Rep. Moran).

31. Notably, the DPPA does not list or identify any specific prohibited uses; rather, it generally prohibits all uses except for the fourteen permissible uses enumerated in 18 U.S.C. §2721(b).

32. As detailed herein, none of the DPPA's permissible uses apply to Defendant's uses as alleged herein.

33. Indeed, 18 U.S.C. §§ 2721(a) and 2722(a) make nondisclosure of personal information the default rule. *See* 18 U.S.C. § 2721(a) ("In general" prohibiting disclosure of

personal information "except as provided in subsection (b)"); 18 U.S.C. § 2722(a) ("It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title."). 18 U.S.C. §2721(b) then lists the fourteen (14) discrete exceptions to non-disclosure, exceptions that, again, do not and cannot apply here.

34. The DPPA creates a private right of action for "the individual" whose personal information was knowingly obtained, disclosed, or used "for a purpose not permitted" under 18 U.S.C. § 2721(b). *See* 18 U.S.C. § 2724(a); 18 U.S.C. § 2722(a) ( "It shall be unlawful for any person knowingly to obtain or disclose personal information . . . for any use not permitted under section 2721(b) of this title.").

**B. *Defendant Obtained, Used & Disclosed Personal Information in Violation of the DPPA***

35. MPS is parking lot management company that uses its proprietary technology to automate parking enforcement.

36. MPS directly provides its services in dozens of cities in the U.S., and MPS's Partners with whom it contracts as their "enforcement vendor" manages more than 1,000 parking lots across the country.

37. To accomplish this, MPS uses its proprietary LPR software, which allows its customers to monitor their parking lots via cameras and without any physical barriers or attendants.

38. In order for MPS to send "invoices" or "notices" to the "violators"—none of whom had provided MPS with their mailing address—MPS collects the license plate information of drivers entering and exiting the lots and then cross references those plate numbers with vehicle registration data from state DMV offices. [1]

39. MPS does not shy away from the fact that it obtains and uses driver information

[1] https://municipalparkingservices.com/solutions-lots-and-garages (last accessed July 10, 2024).

from DMVs to send out its "notices" and "invoices." According to its own website, "***MPS can also perform DMV look ups[.]***"[2]

40. An example of an "Invoice" sent by MPS is attached hereto as Exhibit A.[3]

41. The Invoices that MPS sent to Plaintiffs and Class Members instructs recipients to either pay by check to MPS or to pay online through MPS's Partners' own websites.

42. MPS and its Partners agree to share the revenue from any payments received from alleged parking violators as a result of MPS's "enforcement" services.

43. MPS obtained and misused driver records without Plaintiffs' consent and with no permissible purpose under the DPPA. Indeed, Defendant has never claimed they use driver records from state DMV officers under any permissible purposes.

**PLAINTIFFS' EXPERIENCES**

***Plaintiff Peggy Nelson***

44. Ms. Nelson is a victim of Defendant's scheme. Defendant unlawfully identified her by obtaining her protected personal information from state motor vehicle records without her consent in order to surprise her with bills for parking she never agreed to pay.

45. In or around November of 2022, Ms. Nelson went to the UPS store located at 1116 20th St. S, Birmingham, AL 35205. She parked in the parking lot behind the building with the UPS store. Ms. Nelson previously frequented this location many times, and she always parked in the lot behind the store while she handled her business in UPS. For years, UPS had several designated free parking spots in the lot.

46. On the occasion at issue here, Ms. Nelson did not realize that MPS or one of its

[2] *Id*. (emphasis added).

[3] To be clear, Exhibit A is not a copy of either of the invoices that Plaintiffs received from MPS, but Plaintiffs each received threatening letters from MPS that were substantially similar to Exhibit A.

Partners were now managing the parking lot behind UPS, and she parked in the same spots that she always had. Ms. Nelson did not see any signage or barriers to indicate that it had become a paid lot.

47. Ms. Nelson was in the UPS store approximately 35 minutes, returned to her vehicle, and left the parking lot. She went on with her life.

48. Weeks later, she received a letter entitled "Parking Invoice" addressed from MPS that was mailed to her home address and claimed that she owed $115 for parking in the lot behind UPS.[4] The letter threatened that the invoice amount would increase in a few weeks and that MPS would report her to collections or tow/boot her vehicle if she did not pay.

49. The letter MPS mailed to her home address included her name, home address, license plate number, the make of the motor vehicle, identified the parking lot as the location upon which she incurred the parking fine, and included a picture of the rear of her motor vehicle taken at the entrance of the parking lot that clearly displayed her license plate and license plate number.

50. Ms. Nelson thought there must have been a mistake, so she called MPS. MPS confirmed that it sent her the "invoice" based on the information it had gathered from its cameras and that her vehicle was parked for 35 minutes in the lot behind UPS.

51. Despite a request from Ms. Nelson, MPS refused to void or reduce the invoice.

52. Fearing damage to her credit score or the other consequences that MPS had threatened, Ms. Nelson sent a check to MPS for $115 on December 13, 2022.

53. Ms. Nelson neither provided Defendant with the personal information needed to identify her by name and address nor consented to Defendant accessing or obtaining her DMV records.

[4] MPS's invoice number MPS-8107723.

54. MPS's conduct towards Ms. Nelson was an intrusion upon her seclusion and an invasion of her privacy.

***Plaintiff Christopher Williams***

55. Mr. Williams is a victim of Defendant' scheme. Defendant unlawfully identified him by obtaining his personal information from state motor vehicle records without his consent in order to surprise him with bills for parking he never agreed to pay.

56. On June 25, 2022, Mr. Williams was traveling through Birmingham. He decided to stop to eat at The Original Pancake House located at 1116 20th St. S, Birmingham, AL 35205.

57. Before arriving, he called the restaurant to ask about parking. The restaurant's automated voice recording informed him that there was a free parking lot directly behind the building.

58. Mr. Williams arrived at the restaurant and parked in the lot behind the building as instructed.

59. He ate, returned to his car, and left.

60. Weeks later, Mr. Williams received a letter entitled "Parking Invoice" addressed from MPS that was mailed to his home address and claimed that he owed $75 for parking in the lot behind The Original Pancake House.[5] The letter threatened that the invoice amount would increase in a few weeks and that MPS would report him to collections if he did not pay.

61. The letter mailed to his home address included his name, home address, license plate number, the make of the motor vehicle, identified the parking lot as the location upon which he incurred the parking fine, and included a picture of the rear of his motor vehicle taken at the entrance of the parking lot that clearly displayed his license plate and license plate number.

[5] MPS's invoice number MPS-7484474.

62. Mr. Williams then had to spend time appealing the ticket, explaining that the restaurant had assured him the lot was free to park.

63. Ultimately, MPS or one of its Partners agreed that it should not have sent him the invoice and voided it out.

64. Mr. Williams neither provided Defendant with the personal information needed to identify him by name and address nor consented to Defendant accessing or obtaining his DMV records.

65. MPS's conduct towards Mr. Williams was an intrusion upon his seclusion and an invasion of his privacy.

66. Defendant's misconduct violated—and continues to violate—the DPPA and Defendant has harmed Plaintiffs and Class Members by (1) invading their privacy when obtaining their protected personal information from the DMV—including their names, home addresses, and telephone numbers—without their express consent and (2) by intruding upon their right to seclusion by sending letters and other communications threatening them with collection actions.

67. Upon information and belief, Defendant continues to wrongfully retain Plaintiffs' personal information from their motor vehicle records, and Plaintiffs will be further injured by Defendant's future misuse of their information.

## CLASS ACTION ALLEGATIONS

68. Plaintiffs brings this nationwide class action on behalf of themselves and on behalf of others similarly situated (the "Class"), defined as follows:

> All Persons[6] in the United States who had their personal motor vehicle records (as defined by the DPPA), maintained by a State Motor Vehicle Department, directly obtained, used, redisclosed, and/or resold by Defendant for purposes not permitted by the DPPA in the four years preceding the filing

[6] As "Person" is defined in 18 U.S.C § 2725(2): "'person' means an individual, organization or entity, but does not include a State or agency thereof[.]"

of the Complaint, through the date of any order granting certification of the class.

Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

69. Plaintiffs reserve the right to amend the class definition.

70. This action satisfies the numerosity, commonality, typicality and adequacy requirements under Fed. R. Civ. P. 23.

71. **Numerosity.** Plaintiffs are representative of the proposed Class, consisting of hundreds, if not thousands, of individuals whose motor vehicle records were improperly accessed and obtained by Defendant, far too many to join in a single action;

72. **Commonality**. Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. For example:

a. whether Defendant collected Plaintiffs' and the Class's personal information;

b. Whether Defendant collected Plaintiffs' and the Class's personal information from a motor vehicle record without express consent;

c. whether Defendant unlawfully obtained, disclosed, and/or used Plaintiffs' and the Class's personal information in violation of the DPPA;

d. whether Plaintiffs' and Class Members provided Defendant with express written consent to obtain and use their personal information from State motor vehicle records;

e. whether Defendant's systematic and routine actions were committed willfully or with reckless disregard for the law;

f. the nature and extent of all statutory penalties or damages for which Defendant is liable to Plaintiffs and Class Members, and;

g. Whether punitive damages are appropriate.

73. **Typicality**. Plaintiffs' claims are typical of those of the Class because Plaintiffs—like all members of the Class—had their personal information from motor vehicle records, maintained by a State Motor Vehicle Department, obtained, used, redisclosed and/or resold by Defendant for purposes not permitted by the DPPA.

74. **Adequacy**. Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiffs have suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

75. **Superiority**. Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds or thousands of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be

economically impractical and impose a burden on the courts.

76. The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

77. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, uniform methods of data collection, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

78. Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

## COUNT I
### Violations of the Driver's Protection Privacy Act
### 18 U.S.C. § 2721, *et seq.*

79. Plaintiffs incorporates and realleges the above factual allegations by reference.

80. The Driver's Privacy Protection Act, 18 U.S.C. § 2721(a), *et seq.*, prohibits a person or organization from knowingly obtaining, disclosing, or using personal information contained in motor vehicle records for any purpose not specifically permitted under 18 U.S.C. § 2721(b).

81. Defendant violated and continues to violate 18 U.S.C. §2721, *et seq.*, by intentionally obtaining, using, re- disclosing, and/or reselling Plaintiffs and Class Members' motor vehicle records without knowledge, consent, or authorization for purposes not specifically permitted under the DPPA.

82. Plaintiffs and Class Members are individuals within the meaning of 18 U.S.C. §2725(2).

83. The names, addresses, telephone numbers, and other information that Defendant obtained from motor vehicle records pertaining to Plaintiffs and Class Members was "personal information" as defined under 18 U.S.C. §2725(3).

84. The contents of Plaintiffs' and Class Members' records obtained by Defendant constitute a "motor vehicle record," because they contain records that "pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification card issued by a department of motor vehicles," within the meaning of 18 U.S.C. §2725(1).

85. Defendant was not an authorized recipient under 18 U.S.C. § 2721(c).

86. Defendant knowingly used the personal information it obtained from the DMV motor vehicle records to mail letters to Plaintiffs' and Class Members' addresses and send other communications.

87. Defendant did not obtain express consent from Plaintiffs or Class Members to obtain their personal information from the DMV or use their information for this purpose.

88. As a direct and proximate result of the aforesaid acts and activities of Defendant, Plaintiffs and Class Members have sustained harm including but not necessarily limited to, intrusions upon their seclusion, invasions of their privacy, the time wasted reviewing defendant's collection letters, disputing the invoices, and/or remitting payment.

89. As provided by the DPPA, Plaintiffs and the Class Members seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with DPPA's requirements; (iii) statutory damages of $2,500 for each violation of the DPPA pursuant to 18 U.S.C. § 2724(a) and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all those similarly situated, demand a jury trial on all claims so triable and request that the Court enter an order:

a. Certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representatives, and appointing their counsel to represent the Class;

b. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

c. Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

d. For a declaration that Defendant's actions violated the Federal Driver's Privacy Protection Act, 18 U.S.C. §2721, and for all actual damages, statutory damages, penalties, and remedies available as a result of Defendant's violations of the DPPA, but not less than liquidated damages in the amount of $2,500 for each Plaintiff and each member of the Class.

e. For an order awarding injunctive and equitable relief including, *inter alia*: (i) prohibiting Defendant from engaging in the acts alleged above; (ii) requiring Defendant to disgorge all of its ill-gotten gains to Plaintiffs and the other Class Members, or to whomever the Court deems appropriate; (iii) awarding Plaintiffs and Class Members full restitution of all benefits wrongfully acquired by Defendant by means of the wrongful conduct alleged herein; and, (iv) ordering an accounting and constructive trust imposed on the data, funds, or other assets obtained by unlawful means as alleged above, to avoid dissipation, fraudulent transfers, and/or concealment of such assets by Defendant;

f. For an award to Plaintiffs and the Class of their costs and expenses of this litigation;

g. For an award to Plaintiffs and the Class for their reasonable attorneys' fees;

h. An award to Class Members of damages, including but not limited to: statutory, exemplary, aggravated, and punitive damages, as permitted by law and in such amounts to be proven at trial;

i. For pre-and post-judgment interest as allowed by law, and;

j. For such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury on all issues so triable.

Dated: July 10, 2024,

Respectfully submitted,

*/s/ Austin Whitten*
Jonathan S. Mann (ASB-1083-A36M)
Austin B. Whitten (ASB-7228-K13Y)
**PITTMAN, DUTTON, HELLUMS, BRADLEY & MANN, P.C.**
2001 Park Place North, Suite 1100
Birmingham, AL 35203
Tel: (205) 322-8880
Fax: (205) 328-2711
jonm@pittmandutton.com
austinw@pittmandutton.com

*Attorneys for Plaintiffs and the proposed Class*

**PLEASE SERVE DEFENDANT BY CERTIFIED MAIL AS FOLLOWS:**

Municipal Parking Services, Inc.
c/o C. T. Corporation System Inc.
1010 Dale St. N.
Saint Paul, MN 55117–5603